

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00010-CR

_____

CATRINA MALDONADO, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court No. CR11-00316

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

O P I N I O N

On September 10, 2011, Nathan De Alejandro, a four-year-old child, suffered severe, third-degree burns covering sixty percent of his body. Precisely what caused Nathan's injuries, which ultimately led to his death on September 24, 2011, remains a mystery. What is known, however, is that Nathan lived for fourteen days after suffering these severe injuries; that during those fourteen days, Nathan received no professional medical attention; and that Nathan died as a direct result of these burns and their related complications. It was not until Nathan stopped breathing on September 24, 2011, that his mother, Catrina Maldonado, finally sought assistance for her child. Maldonado pled guilty to the crime of injury to a child by omission[1] and elected to have a Cooke County[2] jury determine her punishment. She was sentenced to life imprisonment. During her punishment trial, Maldonado objected to the admission of a number of photographs depicting the nature and extent of the burn wounds that covered Nathan's body at the time of his death. On appeal, Maldonado claims that the trial court abused its discretion (1) in admitting the photographs and (2) in failing to adequately balance the probative value of the photographs against their unfair prejudicial effect as required by Rule 403 of the Texas Rules of Evidence. *See* TEX. R. EVID. 403. We overrule both points of error and affirm the trial court's judgment.

---

[1] *See* TEX. PENAL CODE ANN. § 22.04 (West Supp. 2014).

[2] Originally appealed to the Second Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We are unaware of any conflict between precedent of the Second Court of Appeals and that of this Court on any relevant issue; however, we have applied the Second Court's precedent where appropriate. *See* TEX. R. APP. P. 41.3.

### I.  The Facts

In the early morning hours of September 24, 2011, Cooke County Emergency Medical Services (EMS) received a call concerning a child in respiratory distress; when they arrived on the scene, they found Maldonado's neighbor, Sue Branch, performing CPR on Nathan.  EMS personnel were unable to resuscitate Nathan, and he was eventually pronounced dead at the hospital.

On September 10—fourteen days before EMS was summoned for assistance—Maldonado left Nathan in the care of her boyfriend, Johnny Earl Alexander, while she went to work.  At 11:03 a.m. on September 10, Alexander called Maldonado and told her that Nathan had been burned in the bathtub.  In reality, sixty percent of Nathan's body was covered with primarily third-degree burns.  While certain aspects of Maldonado's account of the events preceding Nathan's death changed from the time she initially spoke to the police on September 24 to the time she testified at trial, one fact remained consistent throughout—during the fourteen days between the time Nathan was burned and his death, Nathan received no professional medical treatment for his burn injuries.

On September 21, 2014, three days before EMS was contacted, the police were at Maldonado's home looking for Alexander's brother on an unrelated matter.  Officer George Courtney, one of the officers at Maldonado's home on September 21, said he saw a child wrapped from head to toe in blankets.  According to Courtney, whenever the child was touched or moved, he made sounds indicating that he was in "much distress and in pain."  In describing the sounds of distress, Courtney testified,

3

> I have children, most of us do, but there's different cries and different screams. You could just tell that every time that the bed would move or a blanket was moved that he was wrapped in, you could tell that there was some type of pain going on from -- from the voice.

Courtney had no doubt that the child needed immediate medical attention. Maldonado told Courtney that the child had a very bad case of the flu, so Courtney and the other officers kept their distance for fear of contagion. Maldonado also told Courtney that Alexander's parents were taking Nathan to the doctor that day. Courtney had her use his cell phone two or three different times to call Alexander's parents to make sure they were coming. Courtney testified that, had Alexander's parents not arrived to take the child, he believed to see a doctor, he would have summoned EMS to the scene that day

Maldonado was convicted, on her guilty plea, of injury to a child for failing to seek medical attention for Nathan; as previously noted, she was sentenced to life in prison. In a separate proceeding, Alexander was also convicted of injury to a child and sentenced to life imprisonment.[3]

## II.    The Law

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). "That is to say, as long as the trial court's ruling was at least within the zone of reasonable disagreement, the appellate court will not intercede." *Id.*

---

[3]Alexander's conviction is on appeal to the Eighth Court of Appeals under appellate cause number 08-14-00113-CR. Alexander's parents were also charged with neglect in connection with Nathan's death.

4

Under the Texas Rules of Evidence, relevant evidence is generally admissible. TEX. R. EVID. 402. Article 37.07, Section 3(a)(1) of the Texas Code of Criminal Procedure, governing the admissibility of evidence during the punishment phase of a non-capital trial, states, "Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing . . . ." TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West Supp. 2014). In discussing the practical effect of Article 37.07, the Texas Court of Criminal Appeals stated,

> [U]nder Article 37.07, the admissibility of evidence in a non-capital trial is a matter of policy, including the policy of giving complete information to the jury to allow it to tailor an appropriate sentence for the defendant. The result is that what is relevant for the jury to hear during punishment is determined by whatever is helpful to the jury.

*Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007) (citation omitted). With respect to the relevance of photographic evidence, the Court of Criminal Appeals further instructs,

> A photograph should add something that is relevant, legitimate, and logical to the testimony that accompanies it and that assists the jury in its decision-making duties. Sometimes this will, incidentally, include elements that are emotional and prejudicial. Our case law is clear on this point: If there are elements of a photograph that are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if the emotional and prejudicial aspects substantially outweigh the helpful aspects.

*Erazo v. State*, 144 S.W.3d 487, 491–92 (Tex. Crim. App. 2004).

Under Rule 403 of the Texas Rules of Evidence, even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." TEX. R. EVID. 403. "Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery*,

5

810 S.W.2d at 389 (op. on reh'g). Rule 403 requires both trial and reviewing courts to analyze and balance "(1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; [and] (4) the proponent's need for the evidence." *Erazo*, 144 S.W.3d at 489. "In making this determination, we consider factors including: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up shots, whether the body is naked or clothed, the availability of other means of proof, and other circumstances unique to the individual case." *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997).

## III. Application

### A. The Photographs

Maldonado complains that the trial court abused its discretion in admitting some thirty-five photographs depicting the burn wounds on Nathan's body at or near the time of his death. Specifically, Maldonado objected to the admission of six photographs taken by EMS personnel on September 24[4] and to twenty-nine photographs taken by the Dallas County Medical Examiner's Office during the autopsy of Nathan's body.[5] All thirty-five of the contested photographs are 8" x 10" color images showing the nature and extent of the burn wounds that covered Nathan's body. The photographs, which were taken from varying perspectives, angles, and distances, are in focus, and the quality of the images is very good. The photographs show significant portions of Nathan's body covered in black, charred-looking burns. Several of the

_____

[4]State's Exhibits 6–11.

[5]State's Exhibits 18–46.

photographs show burns to Nathan's perineum and anus, and his genitalia and anus are visible in those images. The majority of the photographs, however, show the burns covering Nathan's legs, feet, back, face, arms, chest, and mouth.

### B. Relevance

Maldonado first argues that, because she pled guilty to the charged offense, the photographs depicting Nathan's body at the time of his death were wholly irrelevant to any issue before the jury in Maldonado's punishment trial. According to Maldonado, the fact that Nathan's body was burned severely enough to cause his death was not contested; consequently, she concludes, the only possible motive for introducing the photographs into evidence was to inflame the jurors and prejudice them against Maldonado. But this overlooks the very point of a punishment trial—determining the appropriate punishment for a particular defendant given the specific facts and circumstances of that defendant's crime. A punishment trial is the mechanism by which a jury is allowed to assess the moral blameworthiness of a defendant. *Rodriguez v. State*, 203 S.W.3d 837, 844 (Tex. Crim. App. 2006). Maldonado would apparently have us hold that, by pleading guilty to seriously injuring Nathan, she rendered evidence concerning the nature and extent of Nathan's injuries and/or the effects of her crime irrelevant to the assessment of her moral blameworthiness. While it is true that there is no evidence in the record to suggest that Maldonado actually inflicted the injuries on Nathan, the crime to which she pled guilty was injury to a child, and the issue before the jury was the appropriate punishment for that crime. Maldonado attempted to minimize her blameworthiness by claiming she was fearful of

7

Alexander. It defies logic to suggest that the nature and extent of Nathan's injuries was irrelevant to the determination of Maldonado's punishment.

We find that the pictures at issue in this case, which depicted the severity and extent of Nathan's injuries at the time of his death, were helpful to the jury in assessing Maldonado's moral blameworthiness for her crime. In short, the photographs were relevant notwithstanding Maldonado's guilty plea.

### C.       The First *Montgomery* Factor:   The Probative Value of the Evidence

[T]he relevance value of a photograph is to show appearance. . . . A crime-scene photograph or an autopsy photograph is not admissible simply to show the death of the individual. These photographs are admissible despite the fact, *and because*, they show more than the testimony. But that "something more" must be relevant and helpful to the jury.

*Erazo*, 144 S.W.3d at 493. The photographs at issue here all provided visual images of the appearance of Nathan's body at the time of his death; combined with testimony that the wounds were two weeks old, the photographs gave the jury stark evidence of what the child might have endured during those two weeks. This information was clearly helpful to the jury in assessing Maldonado's moral blameworthiness for her crime. *See Rodriguez*, 203 S.W.3d at 844. Further, the photographs provided context to the witness testimony they accompanied, and, in the case of the twenty-nine autopsy photographs offered through the medical examiner, they helped the jury to understand that testimony.

The six objected-to photographs offered into evidence during Cooke County EMS Paramedic Jacob Blount's testimony provided the jury visual images of what Blount described during his testimony—the appearance of the child when EMS personnel arrived. Similarly, the

8

autopsy photographs offered during Dallas County Medical Examiner Dr. Lynn Salzberger's testimony provided the jury visual images of the nature and extent of the injuries discovered on Nathan's body during Salzberger's examination. Salzberger used the photographs during her testimony to illustrate her findings and to elucidate her testimony. By way of example, Salzberger testified that sixty percent of Nathan's body was burned, that the majority of those burns were third-degree burns, and that there was also evidence of some burns that were less severe than third degree. Salzberger further explained to the jury that third-degree burns are "full-thickness" burns, which means "that the injury damaged the skin to its full-thickness [sic], the whole layer of skin, not just the outside layer." She used the photographs to illustrate the different types of burns on Nathan's body and to illustrate the damage caused by a third-degree burn. One of the autopsy photographs showed Nathan's anus. Salzberger testified that there was a burn injury close to the anus and burns on the perineum, and she used this photograph to illustrate these injuries. Salzberger also testified that there was a burn injury on the base of the child's penis at the groin, and she used a photograph to identify that injury to the jury. Additionally, Salzberger used the photographs to show the jury burn injuries inside Nathan's mouth and across the bridge of his nose. Salzberger used the photographs to identify the severe burns she discovered under Nathan's arms, down the sides of his chest, and on his feet and toes. And finally, she utilized a photograph of a portion of the child's inner neck and one showing his pharynx to illustrate the unusual burn injuries she discovered down Nathan's pharynx, into the top of his esophagus, and below his vocal chords.

9

Salzberger testified that, prior to performing this autopsy, she had never seen burn injuries of the severity suffered by Nathan that went untreated for as long as Nathan's did, and she opined that Nathan would probably have been in "excruciating pain" as a result of his injuries. She also opined that, upon observing such injuries on a child, any reasonable person would have immediately sought medical treatment for that child. The contested photographs precisely fill the role contemplated by the Texas Court of Criminal Appeals in *Erazo*: "they show more than the testimony" they accompany, and that something more is "relevant and helpful to the jury." *Erazo* 144 S.W.3d at 493. The photographs were highly probative in demonstrating the nature and extent of Nathan's injuries, and these were pivotal considerations in determining Maldonado's moral blameworthiness for failing to obtain medical care for Nathan. This factor weighs heavily in favor of admissibility.

**D.    The Second *Montgomery* Factor:  The Potential to Impress the Jury in Some Irrational yet Indelible Way**

The second factor we consider in determining whether the probative value of these photographs is outweighed by the danger of unfair prejudice is the potential of the photographs to impress the jury in some irrational yet indelible way. The thirty-five contested photographs are unquestionably gruesome and disturbing, and they undeniably leave an indelible impression. The photographs offered through both Blount and Salzberger were selected from much larger pools of available photographs, and Salzberger specifically stated that she removed repetitious photographs as well as "the ones that were especially gross."

We agree with Maldonado that these photographs were prejudicial to her defensive theory during the punishment trial. However, Rule 403 does not mandate the exclusion of all

10

prejudicial evidence; rather, its narrow focus is on that evidence with the potential for *unfair* prejudice. *Manning v. State*, 114 S.W.3d 922, 927–28 (Tex. Crim. App. 2003). Relevant evidence becomes unfairly prejudicial when it has some detrimental impact above and beyond proof of the fact or issue that justified its admission in the first place. *Id.* Here, we cannot agree with Maldonado that the prejudicial impact of these photographs was unfair. Stated differently, we find that the impression left on the jury by these photographs, although powerful and likely emotional, was a completely rational impression under the facts and circumstances of this case.

Maldonado emphasizes the gruesome and disturbing nature of the photographs in her efforts to convince us that the photographs are unfairly prejudicial. However, the probative value of a photograph that is gruesome and disturbing to view is not substantially outweighed by the danger of unfair prejudice if it merely depicts the gruesome reality of the injuries sustained by the victim. *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995). As the Texas Court of Criminal Appeals has clearly stated, "A trial court does not err merely because it admits into evidence photographs which are gruesome." *Id.*; *see Davis v. State*, 313 S.W.3d 317, 331 (Tex. Crim. App. 2010); *Drew v. State*, 76 S.W.3d 436, 452 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (where relevant to explain injuries, trial court did not err in admitting autopsy photographs showing (1) victim's head with top portion of skull removed and brain exposed, (2) skull with scalp pulled over victim's face, (3) interior of skull with brain removed, (4) brain outside skull, and (5) excised windpipe).

Given the facts of this case, we cannot say that either the autopsy photographs or the photographs showing the scenes encountered by EMS personnel were likely to impress the jury in an irrational way. This factor weighs in favor of admissibility.

### E.	The Third *Montgomery* Factor:	The Time Needed to Present the Evidence

The State took most of one day to present its evidence, and the trial testimony in its entirety covers in the neighborhood of 300 pages of the reporter's record.[6] Blount's direct examination covers approximately thirty-one pages of the reporter's record, and his description of the challenged photographs covers only three of those pages. This is a fairly insignificant amount of time both in the context of Blount's testimony as a whole and in the context of the trial as a whole. Dr. Salzberger's direct testimony covered approximately forty pages of the reporter's record. After establishing her experience and credentials, she used the challenged photographs throughout her testimony. However, Salzberger used the photographs to elucidate her findings to the jury. Given the manner in which the photographs were used in this case, the issue before the jury, and the particular relevance of the photographs to that issue, we cannot conclude that the amount of time spent presenting this evidence was inappropriate. We find that this is a neutral factor under these circumstances.

### F.	The Fourth *Montgomery* Factor:	The Proponent's Need for the Evidence

The photographs admitted through Blount show Nathan's state at the time EMS personnel arrived. Blount told the jury that Nathan was not breathing and described several

---

[6]After dismissing the jury at the end of the first day of testimony, the trial court stated, "[W]e've got an hour" and encouraged the parties to work on the jury charge during that time. Based on the court's statements to the jury panel throughout the day, we feel safe inferring that most of this first day was consumed by witness testimony.

procedures performed by members of his team in an effort to resuscitate the child. Blount testified that, as a result of the severity and pervasiveness of Nathan's burn injuries, his team was unable to find a vein on either his arms or his legs into which an intravenous needle could be inserted. According to Blount, after he and his team delivered Nathan to the hospital, their supervisor released them for the day—approximately three hours early—because they were all so distraught by Nathan's injuries and his death.

Also, in one of the photographs introduced through Blount and, notably, without objection from Maldonado, Nathan is seen wrapped in a kind of gauze, which covered his burned legs. Blount testified that removing that gauze would have been "excruciatingly painful" if Nathan were still alive.[7] The photographs demonstrated that Blount's testimony was not hyperbole.

The State's theory of the case was that Nathan suffered for two weeks in Maldonado's home when medical treatment was obviously necessary. Maldonado pled guilty to injuring Nathan by failing to seek medical attention for him. The State asked the jury to assess Maldonado's punishment based on the suffering endured by Nathan. Salzberger testified that the injuries were so significant that any reasonable person would have sought medical treatment immediately. She also opined that Nathan could have survived with prompt treatment. Visual evidence of the extent of the injuries was important to illustrate Salzberger's testimony that the wounds would have been "very, very painful." Based on the circumstances of this case and the

---

[7]As previously noted, EMS personnel could not resuscitate Nathan, and he was declared dead at the hospital.

13

extent of the injuries, we find the State had a legitimate need for this evidence. This factor weighs in favor of admissibility.

After considering the *Montgomery* factors, we find that the trial court's decision to admit the challenged photographs was within the zone of reasonable disagreement; the trial court did not abuse its discretion by admitting the photographs. Maldonado's first point of error is overruled.

## IV. Formalities of the Rule 403 Balancing Test

In *Montgomery*, the Texas Court of Criminal Appeals held that, when a party asserts an objection to the admissibility of evidence under Rule 403 of the Texas Rules of Evidence, a trial court is required to conduct a balancing test to determine whether the probative value of the challenged evidence is substantially outweighed by the potential of the evidence to have some unfairly prejudicial effect. *Montgomery*, 810 S.W.2d at 389. Maldonado complains that the trial court failed to perform the mandatory Rule 403 balancing test before admitting the challenged photographs into evidence.

While a trial court must conduct the balancing test when a Rule 403 objection is lodged, there appears to be no requirement that the court formally conduct the test on the record. *See Nolen v. State*, 872 S.W.2d 807, 812 (Tex. App.—Fort Worth 1994, pet. ref'd) (citations omitted); *Houston v. State*, 832 S.W.2d 180, 183–84 (Tex. App.—Waco 1992), *pet. dism'd*,

14

*improvidently granted*, 846 S.W.2d 848 (Tex. Crim. App. 1993) (per curiam).[8]  In the words of

the Second Court of Appeals,

> There is no requirement that the trial court announce for the record that it has conducted and completed the balancing test in its own mind.  The fact that a trial judge made a proper balancing test can be implied from the record.  While the record does not contain a direct discussion by the court of its balancing, we presume the court did perform the mandatory balancing test.

*Nolen v. State*, 872 S.W.2d 807, 812 (Tex. App.—Fort Worth 1994, pet. denied) (citations

omitted).  We are bound by the precedent of our sister court where, as here, the case has been

transferred to us from that court.  *See* TEX. R. APP. P. 43.1.

The record reveals that the trial court carefully considered Maldonado's objections to the

photographs after first obtaining the State's response to the objections raised.  It appears from the

record that the trial court examined each of the contested photographs.  In overruling

Maldonado's objections to the six photographs admitted during Blount's testimony, the court

opined that the jury was entitled to see the extent of the child's injuries, that each photograph

showed different injuries, and that the photographs would assist Blount in his testimony.  Under

these facts and in light of controlling precedent of the Second Court of Appeals, we presume the

trial court performed the mandatory Rule 403 balancing test.

When Salzberger was about to testify using photographs from the autopsy she conducted,

Maldonado objected to State's Exhibit 46, and then made a separate objection to State's Exhibits

18–45.  State's Exhibit 46 is an overhead view of Nathan's body during the autopsy; it shows the

---

[8]*See also Swarb v. State*, 125 S.W.3d 672, 681–82 (Tex. App.—Houston [1st Dist.] 2003, pet. dism'd); *Yates v. State*, 941 S.W.2d 357, 367 (Tex. App.—Waco 1997, pet. ref'd); *Caballero v. State*, 919 S.W.2d 919, 922 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd); *Duckworth v. State*, 833 S.W.2d 708, 710–11 (Tex. App—Beaumont 1992, no pet.).

naked child including the demarcation lines of burned and unburned skin. A card is next to the child with an identifying number corresponding to the autopsy number. The trial court asked if Salzberger needed the photograph to identify the body; she said she did, because of the identifying number. The trial court overruled the objection without comment. Maldonado next objected to State's Exhibits 18–45. On voir dire, Maldonado asked if Salzberger needed the photographs to determine the cause of death. Salzberger answered that she did not need them for that purpose, but that she did need the photographs to explain her findings to the jury. Again, the trial court asked to see the photographs, and the record indicates they were tendered to the court. After reviewing them, Maldonado's objection was overruled without further comment. Under these facts and, again, in light of controlling precedent, we presume that the trial court conducted the mandatory Rule 403 balance.

We find no error in the trial court's failure to conduct an explicit, on-the-record weighing of the Rule 403 considerations. Maldonado's second point of error is overruled.

We affirm the trial court's judgment.



Jack Carter
Justice

Date Submitted:      October 8, 2014
Date Decided:        December 11, 2014

Publish